1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    MARIA DEL ROSARIO CORONA,                     CASE NO. CV F 08-0237 LJO DLB
       as heir of the Estate of OSCAR CRUZ,
12    et al.,                                                        **ORDER ON DEFENDANTS' F.R.Civ.P. 12
                                                                       MOTION TO DISMISS**
13                                     Plaintiffs,            (Doc. 65.)

14           vs.

15    KELLY HARRINGTON, et al,

16                                     Defendants.
                                                                    /
17

18                                              **INTRODUCTION**

19           Defendant California prison officials seek to dismiss as invalid and barred by qualified immunity

20    plaintiffs' equal protection, cruel and unusual punishment, and procedural due process claims arising

21    from a five-month lockdown of Southern Hispanic inmates at Kern Valley State Prison ("KVSP") in

22    Delano, California.  Plaintiffs accuse defendants of substituting defendants' "own facts" for those of

23    plaintiffs' operative First Amended Complaint ("FAC") which plaintiffs contend properly alleges

24    violations of the Eighth Amendment and the equal protection and due process clauses of the Fourteenth

25    Amendment.  This Court considered defendants' F.R.Civ.P. 12(b)(6) motion to dismiss on the record

26    and VACATES the January 25, 2010 hearing, pursuant to Local Rule 230(g).  For the reasons discussed

27    below, this Court DISMISSES plaintiffs' equal protection and procedural due process claims and

28    DENIES dismissal of plaintiffs' Eighth Amendment claim.

# BACKGROUND[1]

## The Parties

Plaintiff Andres Santana ("Mr. Santana") is a KVSP general population inmate who initially was in the highest privilege group. Oscar Cruz ("Mr. Cruz"), prior to his March 2009 death, was a KVSP general population inmate who was in the highest privilege group. Plaintiff Maria Del Rosario Corona ("Ms. Corona") is Mr. Cruz' mother and successor.[2]

Defendant Kelly Harrington ("Warden Harrington") is the KVSP warden. Defendants Chris Chrones ("Warden Chrones") and Mike Knowles ("Warden Knowles") have served as KVSP wardens. Defendant S. Fraunheim ("Cpt. Fraunheim") is a KVSP captain.[3]

## Inmate Classification

On March 13, 2006, Mr. Cruz and Mr. Santana arrived at KVSP Facility D Building 5[4] and were housed as cellmates.

KVSP classifies inmates by ethnicity, such as "White," "Black," "Southern Hispanic" (from Southern California), "Northern Hispanic" (from Northern California), "Mexican National," and "Other." KVSP uses the classifications for cellmate assignments, yard release schedules, and handling disciplinary violations. KVSP classified Mr. Cruz and Mr. Santa as Southern Hispanic. Mr. Cruz and Mr. Santana are Hispanic and originally from Southern California.

## Lockdown After Staff Attack

On May 31, 2006, inmates in Building 6 attacked staff ("staff attack"). Mr. Cruz and Mr. Santana were not involved in the staff attack. KVSP placed all inmates in Buildings 1-8 on lockdown.

As of June 5, 2006, all inmates were: (1) escorted in restraints; (2) subject to unclothed body search prior to movement; (3) cell fed; and (4) allowed no visiting, recreational activities, canteen,

---

[1]     The factual recitation is derived generally from the FAC, the target of defendants' challenges.

[2]     Mr. Santana and Ms. Corona will be referred to collectively as "plaintiffs."

[3]     Wardens Harrington, Chrones and Knowles and Cpt. Fraunheim will be referred to collectively as "defendants."

[4]     All further "Building" references will be as to KVSP Facility D.

1   packages, telephone calls, religious services, and work/educational programs.  Cpt. Fraunheim prepared
2   and recommended these program changes, and Warden Chrones approved them.

3          KVSP interviewed all inmates regardless of ethnicity or gang affiliation.  All inmates involved
4   in the staff attack were placed in KVSP's administrative segregation unit.  On June 14, 2006, Cpt.
5   Fraunheim recommended and Warden Chrones approved a program status change from lockdown to
6   modified to allow critical workers, excluding Southern Hispanics and Mexican Nationals, to enjoy all
7   privileges and to move freely without escorts.  Southern Hispanics remained on lockdown.

8          On June 22, 2006, Cpt. Fraunheim recommended and Warden Chrones approved that "Black,"
9   "White" and "Other" inmates return to normal program with restoration of all privileges.  KVSP had
10  concluded that the staff attack involved only Southern Hispanics or Mexican Nationals.  Hispanic
11  inmates remained on lockdown but regained visiting privileges.

12         Cpt. Fraunheim recommended and Warden Knowles approved, as of July 17, 2006, that inmates
13  assigned to the substance abuse program ("SAP") in Building 5 return to normal program.  Thus,
14  Hispanic Building 5 inmates assigned to SAP regained all privileges.  Hispanic Building 5 inmates not
15  assigned to SAP, including Mr. Cruz and Mr. Santana, remained on the modified program.

16         Cpt. Fraunheim recommended and Warden Knowles approved, effective July 31, 2006, that
17  Hispanic inmates age 35 and older return to normal program with all privileges.  Hispanic inmates not
18  in SAP and less than age 35, including Mr. Cruz and Mr. Santana, remained on modified program.

19                              **Additional Incidents And Lockdown**

20          Plaintiffs claim, on information and belief, that KVSP "used additional incidents not caused by
21  either Cruz or Santana to keep both of them on Lockdown along with other Southern Hispanics, even
22  though KVSP officials did not believe Cruz or Santana were [sic] involved."

23         On August 1, 2006, KVSP claimed that a cooking sheet was missing and that Southern Hispanics
24  were to attack staff with weapons made from the cooking sheet.  A weapon stock was discovered and
25  secreted in cells of inmates of different races, including Southern Hispanics.  All Southern Hispanic
26  inmates were returned to lockdown.

27         On August 22, 2006, Southern Hispanics in Building 3 attacked staff during shower escorts.  On
28  August 30, 2006, Southern Hispanics in Building 3 slipped their cuffs to the front during mass searches

                                            3

of units.  On September 4, 2006, KVSP received information of continued threat toward staff.

On September 7, 2006, pursuant to Cpt. Fraunheim's recommendation and Warden Knowles' approval, all but Southern Hispanic inmates were returned to normal program.  Mr. Cruz and Mr. Santana remained on lockdown although Mr. Cruz and Mr. Santana were not involved in the incidents and KVSP did not suggest that they were.

### Return To Normal Program

During September 2006, Mr. Cruz and Mr. Santana were moved from Building 5 to Building 8.

On October 4, 2006, Cpt. Fraunheim prepared and Warden Knowles approved a calculated return to normal program with Southern Hispanics allowed to receive packages and move without restraints but restricted to their cells.  On October 10, 2006, Cpt. Fraunheim recommended and Warden Knowles approved that Southern Hispanics report to assigned jobs, receive canteen and attend religious services.

On October 16, 2006, Cpt. Fraunheim recommended and Warden Knowles approved that Building 1-4 Southern Hispanics be allowed dayroom access, telephone calls and a normal shower program and that Building 6-8 Southern Hispanics, including Mr. Cruz and Mr. Santana, remain on a more restrictive program with shower escorts and neither dayroom access nor telephone calls.  Southern Hispanics were denied recreation.

On October 23, 2006, Cpt. Fraunheim prepared and Warden Knowles approved that Building 6-8 Southern Hispanics, including Mr. Cruz and Mr. Santana, be allowed dayroom access and telephone calls but no recreation.

Effective November 8, 2006, the lockdown of Southern Hispanics was lifted, and they returned to normal program.

### Plaintiffs' Claims

The FAC charges defendants with execution of "a policy that subjected all Southern Hispanics, including Cruz and Santana, to a disciplinary regime" and targeting "all Southern Hispanics, regardless of their involvement" in the staff attack.  The FAC alleges the absence of a "state of emergency that justified the prison's policy."  The FAC notes that non-Hispanic inmates "had their privileges restored" by June 23, 2006 but that Southern Hispanics' privileges were not restored fully until November 2006. The FAC points out that Hispanic inmates were locked down "solely by virtue of their race" in that they

4

may be "sympathetic to the root cause of a disturbance."  The FAC alleges: "Defendants intentionally and purposefully discriminated against Cruz and Santana in enforcing this disciplinary policy on the basis of race."

As to legal claims under 42 U.S.C. § 1983 ("section 1983"), the FAC alleges:

1.  An "equal protection claim" that Mr. Cruz and Mr. Santana "have been deprived of their right to be free from invidious discrimination based on race as guaranteed by the Equal Protection Clause of the Fourteenth Amendment";

2.  An "Eighth Amendment claim" that defendants' "deprivation of physical activities" caused Mr. Cruz and Mr. Santana "to suffer lower back pain" to constitute "cruel and unusual punishment" to violate the Eighth and Fourteenth Amendments; and

3.  A "due process claim" that Mr. Cruz and Mr. Santana "were deprived of liberty interests protected by the Fourteenth Amendment without due process of law" in that "[n]either inmate received any hearing or other individualized determination concerning the deprivation of their liberty interest at any time prior to or during their subjection to Defendants' disciplinary program."

In addition to compensatory and punitive damages, the FAC seeks declaratory relief that "Defendants' acts, policies and practices . . . violate Plaintiffs' rights under the United States Constitution."  The FAC further seeks injunctive relief to:

1.  Order "KVSP to refrain from affording preferential treatment to inmates on the basis of ethnicity";

2.  Order "KVSP to implement a policy or procedure with which to determine, on an individual basis and without ethnic preference, which inmates may safely be released from lockdown"; and

3.  Prohibit defendants "from harassing, threatening, punishing or retaliating in any way against Plaintiffs because they filed this action."

**DISCUSSION**

**F.R.Civ.P. 12(b)(6) Motion Standards**

Defendants attack plaintiffs' claims as conclusory and barred by qualified immunity.  Plaintiffs

contend that the FAC adequately alleges improper race classifications in lockdowns.

A F.R.Civ.P. 12(b)(6) motion to dismiss is a challenge to the sufficiency of the pleadings set forth in the complaint. "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974); *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  A F.R.Civ.P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).

In resolving a F.R.Civ.P. 12(b)(6) motion, a court must:  (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief.  *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-338 (9th Cir. 1996).  Nonetheless, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). A court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).  Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998).  In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

In *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937,1949 (2009), the U.S. Supreme Court recently explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. (Citations omitted.)

The U.S. Supreme Court applies a "two-prong approach" to address a motion to dismiss:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft*, __ U.S. __, 129 S.Ct. at 1949-1950.

With these standards in mind, this Court turns to defendants' challenges to plaintiffs' claims.

### Equal Protection Claim

Defendants argue that the FAC's equal protection claim is conclusory in the absence of factual allegations of "discriminatory policy." Defendants contend that the equal protection claim constitutes "bare assertions" not entitled to presumption of truth in that the FAC asserts in conclusory terms that KVSP "routinely classifies inmates according to their 'ethnic groups' such as 'White,' 'Black,' 'Southern Hispanic,' 'Mexican National,' or 'Other.'" Defendants point out that pursuant to California prison regulations, such classifications indicate an inmate's association with a "street gang/disruptive group," not ethnicity or race.

Defendants note that although legitimate policy to confine Southern Hispanics during a period of violence "would 'produce a disparate, incidental impact' on Southern Hispanic inmates," the policy

"was not designed" to target Hispanic inmates because of race.  Defendants characterize the initial lockdown, discontinuation of modified program and return to lockdown as "based on the legitimate, nondiscriminatory intent of maintaining order and discipline" and "to prevent further assaults upon staff." Defendants fault the FAC's failure to establish that defendants "purposefully subjected Plaintiffs to lockdown because of their ethnicity" in that defendants sought to keep the persons responsible for the staff attack and further disruptive conduct "securely housed until investigators were reasonably confident that further violent attacks were unlikely."

"Section 1983 imposes two essential proof requirements upon a claimant:  (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-633 (9th Cir. 1988).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3 (1979)). Section 1983 and other federal civil rights statutes address liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042 (1978) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 996 (1976)). "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker,* 443 U.S. at 140, 99 S.Ct. 2689. Stated differently, the first step in a section 1983 claim is to identify the specific constitutional right allegedly infringed. *Albright*, 510 U.S. at 271, 114 S.Ct. at 811.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985). The "purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190

1  (1923).

2      A section 1983 plaintiff alleging an equal protection violation must prove that: (1) the defendants

3  treated plaintiff differently from others similarly situated; (2) the unequal treatment was based on an

4  impermissible classification; (3) the defendants acted with discriminatory intent in applying this

5  classification; and (4) plaintiff suffered injury as a result of the discriminatory classification. *Moua v.*

6  *City of Chico*, 324 F.Supp.2d 1132, 1137 (E.D. Cal. 2004); *see Barren v. Harrington*, 152 F.3d 1193,

7  1194 (9th Cir. 1998) (a section 1983 plaintiff alleging denial of equal protection "must show that the

8  defendants acted with an intent or purpose to discriminate against plaintiff based on membership in a

9  protected class."); *Van Pool v. City and County of San Francisco*, 752 F.Supp. 915, 927 (N.D.Cal.1990)

10  (section 1983 plaintiff must prove purposeful discrimination by demonstrating that he "receiv[ed]

11  different treatment from that received by others similarly situated," and that the treatment complained

12  of was under color of state law).

13      Plaintiffs rest their equal protection claim on a label "Southern Hispanic" which denotes a

14  street/prison gang from Southern California and which comprises Hispanics.  A policy which "is an

15  express racial classification . . . is 'immediately suspect.'" *Johnson v. California*, 543 U.S. 499, 509, 125

16  S.Ct. 1141 (2005).  Plaintiffs argue that the FAC establishes an equal protection violation in that the

17  FAC alleges facts that:

18      1      Defendants "explicitly classified" Mr. Cruz and Mr. Santana "by race and/or ethnicity"

19              and subjected Mr. Cruz and Mr. Santana to extended lockdowns "solely on that basis,

20              rather than on any involvement in any events triggering the lockdown";

21      2.      Mr. Cruz and Mr. Santana remained on lockdown for five months "because KVSP

22              thought 'Hispanic inmates' may be 'involved in or sympathetic to' the underlying

23              disturbance";

24      3.      Defendants' "subjection" of Mr. Cruz and Mr. Santana "to prolonged lockdown was not

25              narrowly tailored"; and

26      4.      Prison officials completed interviews of all inmates "regardless of ethnicity or gang

27              affiliation" but that "noninvolved" Southern Hispanics remained in lockdown.

28      The essence of the equal protection claim is that Hispanic inmates not in SAP and less than age

9

1   35 remained on a five-month lockdown.  Without legal support, plaintiffs attempt to characterize such

2   extended lockdown as an impermissible classification.  Plaintiffs do not challenge meaningfully that

3   Southern Hispanics is a prison/street gang and do not claim that such prison/street gang is entitled to

4   equal protection.  The FAC negates that defendants acted with discriminatory intent in that defendants

5   released from lockdown Hispanic inmates in SAP and/or older than 35.  The prolonged lockdown

6   applied to a limited subset of inmate population, and the FAC alleges no meaningful facts that Mr. Cruz

7   and Mr. Santana were subject to an impermissible classification, especially given the allegations of

8   discovered weapons and staff attacks in August 2006.

9   **Eighth Amendment Claim**

10          As a legal claim, the FAC alleges that deprivation of physical activities caused Mr. Cruz and Mr.

11   Santana's lower back pain to constitute cruel and unusual punishment to violate the Eighth Amendment

12   and the Fourteenth Amendment's due process clause.

13          Plaintiffs argue that the FAC adequately alleges an Eighth Amendment violation in that Mr. Cruz

14   and Mr. Santana were deprived of exercise during the five-month lockdown.  Plaintiffs impose on

15   themselves the burden to "make an objective showing that the deprivation was 'sufficiently serious' to

16   form the basis of an Eighth Amendment violation."  *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir.

17   2005).  As to "sufficiently serious" deprivations, the Ninth Circuit Court of Appeals has explained:

18          In light of the Eighth Amendment's prohibition against cruel and unusual
            punishment, prison officials have a duty to ensure that inmates receive adequate food,
19          clothing, shelter, and medical care. . . . Moreover, "[e]xercise has been determined to be
            one of the basic necessities protected by the Eighth Amendment," . . . and a long-term
20          deprivation of outdoor exercise for inmates is unconstitutional . . .

21   *Hearns*, 413 F.3d at 1042 (citations omitted).

22          Plaintiffs further argue that the Eighth Amendment claim survives in that the FAC alleges that

23   defendants acted "with a sufficiently culpable state of mind," that is, "deliberate indifference."  Plaintiffs

24   attribute the FAC to allege that Mr. Cruz and Mr. Santana "were not subject to any disciplinary measures

25   for their own personal conduct" and that no "unusual circumstances" justified their prolonged lockdown.

26          The Ninth Circuit has clearly established that deprivation of exercise is an Eighth Amendment

27   violation.  Defendants offer nothing meaningful to attack the grounds for the Eighth Amendment claim,

28   which is not subject to dismissal, given that defendants focus on the equal protection and due process

10

1  claims.

2  **<u>Due Process Claim</u>**

3  Defendants contend that the exercise deprivation claim is "governed by the Eighth Amendment

4  and should not be analyzed 'under the rubric of substantive due process.'"

5  "Where a particular Amendment "provides an explicit textual source of constitutional protection"

6  against a particular sort of government behavior, "that Amendment, not the more generalized notion of

7  'substantive due process,' must be the guide of analyzing these claims." *Albright*, 510 U.S. at 273, 114

8  S.Ct. 807, 813 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989)). "[I]f a

9  constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth

10  Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not

11  under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct.

12  1219 (1997).

13  Plaintiffs concede that their Fourteenth Amendment due process claim is procedural, not

14  substantive.  Plaintiffs note that their Eighth Amendment claim does "not negate the procedural due

15  process claims, which challenge the decision to place Plaintiffs on disciplinary segregation without

16  individualized determinations."  Plaintiffs attribute the FAC to allege procedural due process violations

17  resulting from their "classification" and "lockdown as Southern Hispanic."

18  Plaintiffs argue that the FAC alleges Mr. Cruz and Mr. Santana's "significant and atypical

19  hardship" in that their Southern Hispanic classification placed them "in modified programs that deny

20  all access to outdoor exercise for months at a time."  A "prisoner possesses a liberty interest under the

21  federal constitution when a change occurs in confinement that imposes an 'atypical and significant

22  hardship . . . in relation to the ordinary incidents of prison life.'" *Resnick v. Hayes*, 213 F.3d 443, 448

23  (9th Cir. 2000) (alteration in original) (quoting *Sander v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293

24  (1995)).

25  Defendants argue that plaintiffs' denial of due process hearing claim fails in that "procedural due

26  process does not apply when prison officials place prisoners on lockdown status in response to a genuine

27  emergency."  Defendants contend that prisoners are not entitled to a hearing when prison officials

28  initially determine to implement a lockdown or when prison officials determine that emergency status

1    justifies to continue a lockdown.

2          In holding that a five-month lockdown did not deprive prisoners of their liberty without due

3    process, the Ninth Circuit Court in *Hayward v. Procunier,* 629 F.2d 599, 602 (9th Cir. 1980), explained:

4                 It is certainly true that in the ordinary course of events prisoners expect that there
              will be no lockdowns in the absence of an emergency, just as in *Meachum* and *Montanye*
5             prisoners naturally expected that they would not be transferred in the absence of
              misconduct, "unless it be assumed that transfers are mindless events". . . . But the
6             Supreme Court found that type of expectation to be too ephemeral to give rise to a due
              process liberty interest, and we think the same conclusion follows in the present case.

7
                 There is another fundamental defect in the procedural due process arguments of
8             the prisoners, and it lies in the nature of the hearing they seek. In every case cited by
              plaintiffs or revealed by our research in which prisoners were found to be entitled to a
9             due process hearing, the subject of that hearing was the fate of individual prisoners, and
              the facts to be examined dealt with their conduct or their condition. . . . In this case,
10            however, the facts in dispute are not those which would differentiate the plaintiffs from
              the general prison population and cause them to be subjected to distinctive treatment.
11            The conduct of the plaintiffs is not in issue. Instead, the question to be decided is whether
              the degree of emergency justifies a continuation of the lockdown – a determination
12            involving a high degree of policy and prediction. (Citations omitted.)

13         As to Mr. Cruz and Mr. Santana, the key is whether the degree of emergency justified the

14   continuation of the lockdown of which they complain.  To address this issue, the FAC alleges: "There

15   was no state of emergency that justified the prison's policy."  Plaintiffs argue that "no emergency existed

16   that justified the five-month lockdown."  Plaintiffs note that the "right" at issue "is not to be free from

17   lockdowns, but from *racially discriminatory* lockdowns."  (Italics in original.)

18         The procedural due process claim rests on the conclusory claim that no emergency existed to

19   justify a five-month lockdown.  Plaintiffs do not appear to contest the initial lockdown based on the staff

20   attack.  They appear to contest the continuation of lockdown of Hispanic inmates under age 35.  As

21   noted above, the continued lockdown applied to a limited prison population and not to Hispanics as a

22   whole.  Plaintiffs themselves refer to the lockdown inmates as a "sub-group."  Decisions to maintain the

23   lockdown for the sub-group "is not a disciplinary measure, but an administrative strategy designed to

24   preserve order in the prison and protect the safety of all inmates" as well as staff.  *See Munoz v.*

25   *Rowland*, 104 F.3d 1096, 1098 (9th Cir. 1997).  The maintenance of the lockdown for the "sub-group"

26   is akin to assigning suspected gang affiliates to particular prison housing units which "is essentially a

27   matter of administrative discretion."  *See Munoz*, 104 F.3d at 1098.  In the absence of challenge to their

28   Southern Hispanic affiliation, the FAC fails to establish a procedural due process violation for the

1   continued lockdown of Hispanic inmates under age 35.  Moreover, plaintiffs offer no hint as to what

2   procedural due process they claim to which Mr. Cruz and Mr. Santana were entitled.  The due process

3   claim fails.

4   ### Qualified Immunity

5   Defendants contend that they are entitled to qualified immunity in that their "actions were

6   objectively reasonable" given "a compelling interest in prison safety."  Plaintiffs contend that their

7   claims avoid qualified immunity in that the FAC establishes violations of the Eighth Amendment and

8   Fourteen Amendment's equal protection and due process clauses.

9   ### Purpose And Elements

10  Qualified immunity is a defense to claims against governmental officials "arising out of the

11  performance of their duties.  Its purpose is to permit such officials conscientiously to undertake their

12  responsibilities without fear that they will be held liable in damages for actions that appear reasonable

13  at the time, but are later held to violate statutory or constitutional rights." *Kraus v. Pierce County*, 793

14  F.2d 1105, 1108 (9th Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571 (1987).  Qualified immunity

15  protects section 1983 defendants "from liability for civil damages insofar as their conduct does not

16  violate clearly established statutory or constitutional rights of which a reasonable person would have

17  known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).  The "heart of qualified

18  immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the

19  case.  Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be

20  is true, any allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.

21  1995).

22  "Qualified immunity balances two important interests – the need to hold public officials

23  accountable when they exercise power irresponsibly and the need to shield officials from harassment,

24  distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, __ U.S. __,

25  129 S.Ct. 808, 815 (2009).  The protection of qualified immunity applies regardless of whether the

26  government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions

27  of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004) (Kennedy, J., dissenting)

28  (citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894 (1978) (noting that qualified immunity

13

covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Courts stress "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991). "Immunity ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). "Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)). To analyze qualified immunity, a court determines: (1) what right has been violated; (2) whether that right was so "clearly established" at the time of the incident that a reasonable officer would have been aware of its constitutionality; and (3) whether a reasonable public officer could have believed that the alleged conduct was lawful. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998), *cert. denied*, 525 U.S. 1016, 119 S.Ct. 540 (1988).[5]

"The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, __ U.S. __, 129

---

[5]      In *Brown v. Li*, 308 F.3d 939, 946-947 (9th Cir. 2002), *cert. denied*, 538 U.S. 908, 123 S.Ct. 1488 (2003), the Ninth Circuit explained the "three-step test" in greater detail:

> First, we must determine whether the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a constitutional right. . . . Next, if the facts alleged show a constitutional violation, we must decide whether the constitutional right at stake was clearly established at the time of the alleged violation. . . . Finally, if the right was clearly established, we assess whether an objectively reasonable government actor would have known that his or her conduct violated the plaintiff's constitutional right.  (Citations omitted.)

1    S.Ct. at 818.

2    ***Clearly Established Right***

3        Plaintiffs note that defendants raise qualified immunity only as to the Eighth amendment and

4    equal protection claims, not the due process claim. As such, the "rights" as to qualified immunity

5    asserted here are inmate outdoor exercise and equal protection from prolonged lockdown of a subgroup

6    of Hispanic inmates.

7        The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official

8    would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the

9    unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987).

10   The alleged violated right "must have been 'clearly established' in a more particularized, and hence more

11   relevant sense." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.  Plaintiffs are unable to establish a

12   clearly established right "by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639,

13   107 S.Ct. at 3039.  "This is not to say that an official action is protected by qualified immunity unless

14   the very action in question has previously been held unlawful . . .; but it is to say that in the light of

15   pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

16       "To determine that the law was clearly established, we need not look to a case with identical or

17   even 'materially similar' facts." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003), *cert. denied*,

18   543 U.S. 825, 125 S.Ct. 43 (2004).  "Rather, the 'standard is one of fair warning: where the contours of

19   the right have been defined with sufficient specificity that a state official had fair warning that [his]

20   conduct deprived a victim of his rights, [he] is not entitled to qualified immunity.'" *Serrano*, 345 F.3d

21   at 1077 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)).  "[O]fficials can still be on

22   notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*,

23   536 U.S. 730, 741, 122 S.Ct. 2508 (2002).

24       A plaintiff "bears the initial burden of proving that the rights allegedly violated by [defendants]

25   were clearly established at the time of the alleged misconduct." *Houhgton v. South*, 965 F.2d 1532, 1534

26   (9th Cir. 1992) (citing *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020 (1984); *Baker v.*

27   *Racansky*, 887 F.2d 183, 186 (9th Cir.1989)).

28   / / /

1

Denial Of Outdoor Exercise

2   Defendants contend that inmates have "no clearly established right to outdoor exercise during

3   times of ongoing violence and disruptive behavior."  Defendants argue that denial of prisoner "outdoor

4   exercise" is not an "absolute" right and that they were entitled to rely on Ninth Circuit authority "when

5   making the decision to curtail outdoor exercise."  Defendants cite to *Norwood v. Vance*, 572 F.3d 626

6   (9th Cir. 2009) (prison official granted qualified immunity for alleged Eighth Amendment violation to

7   deprive outdoor exercise); *LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993) (rejecting prisoner's

8   Eighth Amendment claim because his "loss of outside exercise privileges is directly linked to his own

9   misconduct, which raises serious and legitimate security concerns within the prison"); *Hayward v.*

10  *Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (district court correctly determined that restrictions of a

11  five-month lockdown "did not cross the eighth amendment line").

12  Plaintiffs argue that defendants are not entitled to qualified immunity based on FAC allegations

13  that no emergency warranted Mr. Cruz and Mr. Santana's prolonged lockdown.  Plaintiffs note that

14  *Hearns* and authority cited therein provided "'fair warning' that completely depriving individuals of

15  outdoor exercise for sustained period of time, such as five months, constituted a violation of the Eighth

16  Amendment."  Plaintiffs point to *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994), where prison

17  officials were denied qualified immunity for an inmate's Eighth Amendment claim based on only 45

18  minutes per week of outdoor recreation during a six-week period, and the Ninth Circuit's

19  pronouncement in *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996): "Deprivation of outdoor exercise

20  violates the Eighth Amendment rights of inmates to continuous and long-term segregation."  Plaintiffs

21  argue that the FAC alleges facts that do not rise to "extraordinary violence" at issue in *Norwood*.

22  There is no doubt that exercise is a basic necessity protected by the Eighth Amendment and that

23  its long-term deprivation is unconstitutional.  *See Hearns*, 413 F.3d at 1042.  Under the circumstances

24  alleged in the FAC, Mr. Cruz and Mr. Santana's right to outdoor exercise is clearly established, and

25  defendants' arguments to the contrary are unavailing.

26

Gang Affiliation

27  Defendants argue that "gang-based differentiation" is not clearly established as unconstitutional

28  "in the context of prison lockdown, subsequent stepped unlock, and modified programs" to restore

1   prison order. Defendants note that they considered inmates' gang affiliation, program status and age and

2   released Southern Hispanics whom "they believed could program safely based upon all of those factors."

3   "Where apparently race-related violence requires a prison-wide lockdown, inmates who are

4   members of those races involved in the violence should be precluded from performing even critical

5   functions until adequate investigation clears them, lest they inflict further violence – or themselves

6   become victims." *Walker v. Gomez*, 370 F.3d 969, 975 (9th Cir. 2004). "[P]rison authorities

7   investigating gang-related violence and attempting to restore safety and order might rationally take race

8   into account in implementing lockdown procedures." *Walker*, 370 F.3d at 976.

9   Plaintiffs respond that based on *Johnson v. California*, 543 U.S. 499, 125 S.Ct. 1141 (2005),

10   defendants had "fair warning" that "racial classifications and segregation could be imposed <u>only</u> in the

11   face of <u>imminent</u>, <u>race-related</u> violence." Plaintiffs rely on the following parenthetical quotation from

12   *Johnson*, 543 U.S. at 512-513, 125 S.Ct. 1141: "(citing *Lee* for the proposition that 'only a social

13   emergency rising to the level of imminent danger to life and limb – for example, a prison race riot,

14   requiring temporary segregation of inmates – can justify an exception to the principle embodied in the

15   Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes

16   among citizens' " (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)

17   (Harlan, J., dissenting)))."

18   As explained above, plaintiffs have failed to establish an impermissible classification as to

19   Hispanic inmates not in SAP and less than age 35, especially given lack of a meaningful challenge that

20   Southern Hispanics is a prison/street gang entitled to equal protection. Plaintiffs fail to substantiate "fair

21   warning" of unconstitutionality of continued lockdown of a sub-group of Hispanic inmates not in SAP

22   and/or less than age 35 in light of acknowledged weapons discovery and continued staff attack. *Johnson*

23   fails to support fair warning to deny qualified immunity in that the U.S. Supreme Court in *Johnson* held

24   that the strict scrutiny standard of review, rather than "reasonably related to legitimate penological

25   interest" standard, governed an inmate's equal protection challenge to a policy to place new or

26   transferred inmates double-celled during initial 60-day evaluation with cellmates of same race. *Johnson*,

27   543 U.S. at 515, 125 S.Ct. 1141. "Strict scrutiny does not preclude the ability of prison officials to

28   address the compelling interest in prison safety." *Johnson*, 543 U.S. at 514, 125 S.Ct. 1141. Qualified

17

1   immunity further supports dismissal of plaintiffs' equal protection claim in the absence of a clearly

2   established right to support it.

3   ***Reasonable Belief***

4   The next step in the qualified immunity evaluation is whether defendants reasonably believed

5   they were entitled to deny outdoor exercise to Mr. Cruz and Mr. Santana.

6   "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled

7   to the immunity defense." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151 (2001). "The question

8   is what the officer reasonably understood his powers and responsibilities to be, when he acted under

9   clearly established standards." *Saucier*, 533 U.S. at 208, 121 S.Ct. 2151. "Qualified immunity shields

10  an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably

11  misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S.

12  194, 198, 125 S.Ct. 596, 599 (2004). "Officers can have reasonable, but mistaken, beliefs as to the facts

13  establishing the existence of probable cause or exigent circumstances, for example, and in those

14  situations courts will not hold that they have violated the Constitution." *Saucier*, 533 U.S. 194, 121

15  S.Ct. at 2158. Officials in "tense situations" are afforded "broad discretion" and "immunity even when

16  officers make mistakes." *See Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

17  A defendant "carries the burden of proving that his 'conduct was reasonable under the applicable

18  standards even though it might have violated [plaintiff's] constitutional rights.'" *Houghton v. South*, 965

19  F.2d 1532, 1534 (1992) (quoting *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir.1988)).

20  Defendants argue that if plaintiffs' right to outdoor exercise was violated, inquiry turns to

21  "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

22  confronted." Defendants point to their need "to weigh the interest of the prisoners to enjoy outdoor

23  exercise and the other benefits of normal programming on the one hand, and the safety and security of

24  prisoners and staff on the other." Defendants assert that given the "unusual circumstances," their

25  decision, even if mistaken, was reasonable to ensure inmate safety. *See Norwood*, 572 F.3d at 633

26  ("While denying outdoor exercise for extended periods carried some risk of harm, officials' judgment

27  that there was a greater risk of harm from allowing outdoor exercise was certainly reasonable.")

28  Plaintiffs contend that defendants offer no "extraordinary circumstances" to excuse deprivation

18

1    of Mr. Cruz and Mr. Santana's clearly established rights.

2        Defendants may be correct in their evaluation of denial of outdoor exercise to the sub-group of

3    Hispanic inmates not in SAP and/or less than age 35.  However, the reasonableness of denial of outdoor

4    exercise to the sub-group is ripe with factual issues which have not been fully explored, including the

5    volatility of future staff attacks or similar violence.  Defendants' acknowledgment of need to "weigh"

6    competing interests suggests a factual evaluation not available at this pleading stage.  The FAC's four

7    corners reveals episodes of inmate violence but suggests quieted periods for which denial of outdoor

8    exercise may have been unwarranted.  This Court cannot assess the risk of allowing outdoor exercise

9    when limited to the FAC's allegations.  Defendants fail to establish qualified immunity on the Eighth

10   Amendment claim.

11       Given the absence of a clearly established equal protection right as alleged by plaintiffs, this

12   Court need not address whether denial of such right was reasonable.

13                              **Injunctive Relief**

14       The FAC alleges, on information and belief, that "since November 2006, KVSP has kept

15   Southern Hispanic inmates on lockdown for months at a time on several separate occasions" and that

16   "KVSP intends to continue its pattern and practice of placing Southern Hispanic inmates on Lockdown

17   for indefinite periods of time based on its racial categorizations, and without regard to individual

18   wrongdoing."

19                                *Elements*

20       To prevail, the party seeking injunctive relief must show either "(1) a likelihood of success on

21   the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the

22   merits and the balance of hardships tipping in [the moving party's] favor."  *Oakland Tribune, Inc. v.*

23   *Chronicle Publishing Company, Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985), *quoting Apple Computer,*

24   *Inc. v. Formula International, Inc.*, 725 F.2d 521, 523 (9th Cir. 1984).  Plaintiffs need not show

25   positively that they will prevail on the merits. A reasonable probability of success, not an overwhelming

26   likelihood, is all that need be shown for preliminary injunctive relief.  *Gilder v. PGA Tour, Inc.*, 936

27   F.2d 417, 422 (9th Cir. 1991); *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003) ("Our court also

28   uses an alternative test that requires the applicant to demonstrate either: a combination of probable

                                       19

1   success on the merits and the possibility of irreparable injury; or serious questions going to the merits

2   and that the balance of hardships tips sharply in the applicant's favor.")  The two formulations represent

3   two points on a sliding scale with the focal point being the degree of irreparable injury shown.  *Oakland*

4   *Tribune*, 762 F.2d at 1376.  "Under either formulation of the test [for injunctive relief], plaintiff must

5   demonstrate that there exists a significant threat of irreparable injury."  *Oakland Tribune*, 762 F.2d at

6   1376.

7                                        ***Mootness As To Mr. Cruz***

8           Defendants argue that an injunctive relief claim for Mr. Cruz is moot given his death.  *See*

9   *Kennerly v. United States*, 721 F.2d 1252, 1260 ("Because of his death, the question of injunctive relief

10  as to [plaintiff] is now moot.")

11          Plaintiffs offer nothing meaningful to vitalize injunctive relief on Mr. Cruz' behalf given his

12  death.  As such, an injunctive relief claim on his behalf is subject to dismissal.

13                                 ***Immediate Threat As To Mr. Santana***

14          Defendants fault the FAC's failure to allege facts to support future unconstitutional lockdowns

15  and characterize the FAC's allegations as "gross speculation regarding anticipated future activity and

16  the expected future infringement of their constitutional rights."  Defendants attribute Mr. Santana to lack

17  standing to seek injunctive relief in the absence of future harm given that the FAC addresses conduct

18  over a past five-month period.

19          Defendants appear to equate standing with the immediate threat requirement for injunctive relief.

20  Equitable remedies are "unavailable absent a showing of irreparable injury, a requirement that cannot

21  be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again

22  – a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons*, 461 U.S.

23  95, 111, 103 S.Ct. 1660, 1670 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669 (1974)).

24  The plaintiff must allege "that the plaintiff 'has sustained or is immediately in danger of sustaining some

25  direct injury' as the result of the challenged statute or official conduct."  *O'Shea*, 414 U.S. at 494, 94

26  S.Ct. 669 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601 (1923)).  "The injury

27  or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea*, 414

28  at 494, 94 S.Ct. 669 (citing several cases).

1    The FAC alleges that Mr. Santana has been subject to lockdowns which he characterizes as
2    unconstitutional.  As such, the question turns to whether the FAC pleads a real or immediate threat of
3    future harm.  This situation is not akin to police chokeholds in *Lyons*, 461 U.S. 95, 103 S.Ct. 1660, on
4    which defendants rely.  Plaintiffs note that the FAC alleges "facts showing *both* a past harm, and the real
5    immediate nature of the future harm."  Plaintiffs point out that as an incarcerated inmate, Mr. Santana
6    is subject to "a continuous policy of discrimination that could recur at any time" in that the threat of
7    repeated injury remains" regardless of Mr. Santana's actions.

8    Plaintiffs are correct in part.  Based on the adequately alleged Eighth Amendment claim, the FAC
9    supports potential injunctive relief to avoid prolonged denial of outdoor exercise.  *See Doe v. U.S. Dept.*
10   *of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985) ("it need not appear that the plaintiff can obtain the
11   specific relief demanded as long as the court can ascertain from the face of the complaint that some relief
12   can be granted").

13                                    ***Ripeness As To Mr. Santana***

14   Defendants further argue that injunctive relief as to Mr. Santana is not ripe in that the FAC's
15   allegations of "unspecified future lockdowns" are "too speculative."  Defendants cite to *U.S. West*
16   *Communications v. MFS Intelenet, Inc.*, 193 F.3d 1113, 1118 (9th Cir. 1999), *cert. denied*, 530 U.S.
17   1284, 120 S.Ct. 2741 (2000), where the Ninth Circuit addressed review of utilities commission action
18   and observed that to consider whether a case is ripe for review a court evaluates "the fitness of the issues
19   for judicial decision" and "the hardship to the parties of withholding court consideration."  Defendants
20   do not address either factor.

21   Defendants fail to address meaningfully the ripeness issue.  Defendants appear to address the
22   scope of potential injunctive relief, a key issue to be addressed in the future.

23                                    ***Adequate Remedy At Law***

24   Lastly, defendants fault the FAC's failure to allege irreparable harm and absence of adequate
25   legal remedy.  Defendants note that if Mr. Cruz and Mr. Santana "suffered an injury barred by the
26   Federal Constitution" they have a "remedy for damages under § 1983."  *See Lyons*, 461 U.S. at 113, 103
27   S.Ct. 1660.

28   Defendants fail to establish that monetary damages alone are an adequate remedy for the Eighth

Amendment claim.  Again, defendants' points appear to address the scope of potential injunctive relief, not its potential availability.

### Attempt To Amend

As an alternative to dismiss, plaintiffs request an attempt to amend dismissed claims.  Plaintiffs identify nothing concrete to support an attempt to amend.  The factual and legal issues are straightforward.  Allegation of additional facts offers nothing for evaluation of the equal protection and due process claims.  As such, an attempt at amendment is not warranted.  Moreover, this Court has thoroughly reviewed and consider the recent decision of *Richardson v. Runnels*, 2010 DJDAR 567 (9th Cir. 2010), and finds it distinguishable.

### CONCLUSION AND ORDER

For the reasons discussed above, this Court:

1.    DISMISSES with prejudice plaintiffs' equal protection and due process claims;

2.    DENIES dismissal of plaintiffs' Eighth Amendment claim;

3.    LIMITS potential injunctive relief to the scope of the remaining Eighth Amendment claim; and

4.    ORDERS defendants, no later than February 5, 2010, file and serve an answer to plaintiffs' remaining Eighth Amendment claim.

IT IS SO ORDERED.

**Dated:    January 20, 2010**                    _____/s/ Lawrence J. O'Neill_____
                                           UNITED STATES DISTRICT JUDGE