IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA DEL ROSARIO CORONA, et al., | Case No. 1:08-cv-00237-LJO-BAM |
| Plaintiffs, | ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | (Doc. 142) |
| MIKE KNOWLES, et al., | |
| Defendants. | |
| _____ / | |

In this civil rights action, Plaintiffs Maria del Rosario Corona and Andres Santana (collectively "Plaintiffs") claim that Defendants Kelly Harrington, Chris Chrones, Mike Knowles, and S. Frauenheim (collectively "Defendants") deprived Oscar Cruz and Andres Santana of adequate outdoor exercise in violation of the Eighth Amendment. Now pending before the Court is Defendants' motion for summary judgment. Plaintiffs have opposed the motion, and Defendants have replied. For the reasons set forth below, the Court GRANTS the motion for summary judgment.

I.   **BACKGROUND**

   **A.   Factual Background[1]**

      **1.   The Parties**

Plaintiff Andres Santana ("Plaintiff Santana") is a state prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"). Oscar Cruz ("Mr. Cruz") was also, prior to

---

[1] The Court carefully reviewed and considered the record, including all evidence, arguments, and objections filed by the parties. Omission of reference to evidence, an argument, or objection is not to be construed that the Court did not consider the evidence, argument, or objection. The Court applied the evidence it deemed to be admissible, material, and appropriate for summary adjudication. This Court does not rule on evidentiary matters in the summary judgment context unless otherwise noted.

1

his death on March, 18, 2009, a state prisoner in the custody of the CDCR. At all times relevant to this action, Plaintiff Santana and Mr. Cruz were identified as being "Southern Hispanic" inmates and were housed together at Kern Valley State Prison ("KVSP"). Specifically, from March 2006 to July 2006, the two were cellmates in Facility D, Building 5; then, from July 2006 to February 2007, the two were cellmates in Facility D, Building 8. Plaintiff Maria del Rosario Corona is Mr. Cruz' mother and is now proceeding in this action as Mr. Cruz' successor.

The defendants in this action are current and former KVSP prison officials. Defendant Martin Biter is the current warden of KVSP.[2] Defendants Kelly Harrington, Chris Chrones, and Mike Knowles are former wardens of KVSP. Lastly, Defendant S. Fraeunheim was a facility captain at KVSP during the times relevant to this action.

**2.   The May 31, 2006 Assault**

On May 31, 2006, approximately twenty-five Southern Hispanic inmates were involved in an assault on prison officials. The incident began around 7:00 p.m. when two Southern Hispanic inmates attacked two correctional officers who were attempting to rehouse the inmates in Facility D, Building 6, Section C. As the fighting moved into the rotunda area of the building, two other Southern Hispanic inmates joined in the assault. When the control booth attempted to seal the area by closing the section door, approximately twenty inmates ran to the door and attempted to keep it from closing. The inmates were heard shouting, "Don't let them close the door! Kick their heads in!" Three of the inmates made it past the door and joined the assault. Additional correctional officers eventually arrived at the scene and ended the attack by using force. In the end, five correctional officers were battered. Their injuries ranged from superficial redness to a dislocated right wrist.

**3.   Lockdown**

As a result of the assault, all inmates housed in Facility D were placed under lockdown pending an administrative review into the incident. A lockdown typically involves the restriction of inmates to their cells and suspension of all but the most essential programs and functions. The facility captain is

---

[2] Although Plaintiffs did not identify Defendant Biter as a defendant to this action, he has been included as part of this lawsuit to the extent that Plaintiff Santana sues Defendant Kelly Harrington in his official capacity for injunctive relief. (See ECF No. 142, Defs.' Not. and Mot. for Summ. J., at 1 n.1). See also Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[W]hen officials sued in [their official capacity] . . . die or leave office, their successors automatically assume their roles in the litigation.") (citing Fed. R. Civ. P. 25(d)(1)).

2

generally responsible for recommending that a lockdown be imposed, and the warden either approves or denies the facility captain's recommendation. The warden and prison staff are then responsible for determining when the lockdown should end. According to CDCR policy, lockdowns should be lifted, and all inmates are to be returned to normal programming and privileges, as soon as prison staff have determined that it is safe to do so.

Once the lockdown of Facility D was imposed, prison officials began an investigation into the assault. Prison officials initiated a search of Facility D and interviewed all inmates, regardless of the inmate's ethnicity or gang affiliation. Prison officials also worked with the Investigative Services Unit ("ISU") and the Law Enforcement Investigation Unit ("LEIU") in Sacramento, California to determine the underlying cause of the assault. Of particular concern was whether the attack was planned as part of a system-wide assault on prison staff or a spontaneous attack confined to KVSP. After completing an initial investigation, prison officials concluded that only Southern Hispanic and Mexican National inmates were involved in the assault.

### 4. Modified Programming

By June 20, 2006, all Facility D inmates except those who were considered to be a part of the Southern Hispanic or Mexican National groups were released from lockdown and returned to normal programming. As for Southern Hispanic and Mexican National inmates, they were kept on modified programming. Modified programming generally entails affording inmates certain privileges such as visitation rights, but denying other privileges such as outdoor exercise. Modified programming is lifted when prison staff determine it is safe to do so.

Defendants Chrones, Knowles, and Frauenheim, who were largely responsible for authorizing, implementing, and monitoring the lockdown and subsequent modified programming, decided to take a calculated, phased approach to returning Southern Hispanic and Mexican National inmates to normal programming. First, on July 17, 2006, all Southern Hispanic and Mexican National inmates housed in Facility D, Building 5 and assigned to the Substance Abuse Program ("SAP") were returned to normal programming. Then, on July 31, 2006, all Southern Hispanic and Mexican National inmates over the age of 35 were returned to normal programming. The plan was to continue this gradual process until all inmates were returned to normal programming.

However, on July 31, 2006, a confidential informant advised prison staff that two mental sheet pans were missing from the Facility D kitchen and that inmates were planning to use the metal in order to fashion weapons to attack prison staff. In response, prison officials returned all inmates in Facility D to modified programming while prison staff searched Facility D and investigated the matter. Prison staff ultimately discovered multiple pieces of weapon stock hidden inside the mattresses of Southern Hispanic and White inmates.

By August 21, 2006, prison officials were unable to substantiate the threats made against prison staff. Thus, Black, White, and "Other" inmates housed in Facility D, Buildings 1, 2, 3, 4, 6, 7, and 8 were returned to normal programming on August 23, 2006. As for Southern Hispanic inmates housed in Facility D, however, a series of incidents purportedly delayed their return to normal programming. On August 4, 2006, fifty-seven Southern Hispanic inmates occupying thirty cells in Facility D, Building 7 covered their cell windows, refused to comply with orders to remove the coverings, and ultimately required forced cell extraction. On August 22, 2006, Southern Hispanic inmates in Facility D, Building 3 attacked staff while being escorted to the showers. On August 30, 2006, Southern Hispanic inmates in Facility D, Building 3 slipped their handcuffs to the front of their body during cell searches, which allowed the inmates to use the restraints as weapons. On September 1, 2006, ISU received information from a confidential informant that the May 31, 2006 assault had been planned in advance. Finally, on September 11, 2006, a confidential source indicated that Southern Hispanic inmates intended to "rush" the program office once they were returned to normal programming.

Ultimately, on September 28, 2006, Defendant Frauenheim recommended a calculated, phased return to normal programming for Southern Hispanic inmates housed in Facility D. Despite an assault by Southern Hispanic inmates on staff on October 24, 2006, Defendant Frauenheim's recommendation was generally implemented as planned. By October 30, 2006, Southern Hispanic inmates in Buildings 1, 2, and 3 were returned to normal programming. By November 6, 2006, Southern Hispanic inmates in Buildings 7 and 8 were returned to normal programming. And by November 8, 2006, all Southern Hispanic inmates had been returned to normal programming.

Plaintiff Santana and Mr. Cruz were housed in Building 8 during this time and therefore were returned to normal programming by November 6, 2006. In total, Plaintiff Santana and Mr. Cruz spent

4

just over five consecutive months in either lockdown or modified programming, and throughout that time they were denied certain privileges such as outdoor exercise.

### B. Procedural History

Plaintiffs initiated this action on February 19, 2008, and are presently proceeding on their first amended complaint. The Court found, upon consideration of Defendants' motion to dismiss, that the first amended complaint states cognizable claims for the deprivation of adequate outdoor exercise in violation of the Eighth Amendment. Plaintiffs' equal protection and due process claims, however, were dismissed with prejudice, as was Mr. Cruz' request for injunctive relief. On June 15, 2012, Defendants filed the now pending motion for summary judgment. Plaintiffs filed an opposition to the motion on August 3, 2012, and Defendants filed a reply on August 10, 2012. Pursuant to Local Rule 230(g), the Court found this matter to be suitable for decision without oral argument.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the disclosure materials, the discovery, and the affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party. Id.

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323).

If the movant has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).  The nonmoving party must go beyond the allegations set forth in its pleadings.  See Fed. R. Civ. P. 56(c).  "[B]ald assertions or a mere scintilla of evidence" will not suffice.  Stefanchik, 559 F.3d at 929.  Indeed, the mere presence of "some metaphysical doubt as to the material facts" is insufficient to withstand a motion for summary judgment.  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Id. at 587.

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence."  Soremekun, 509 F.3d at 984.  That remains the province of the jury.  See Anderson, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Id.  Inferences, however, are not drawn out of the air; the nonmoving party must provide a factual predicate from which the inference may justifiably be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

**III.   DISCUSSION**

Defendants raise four arguments in their motion.  First, Defendants argue that they are entitled to summary judgment on Plaintiffs' Eighth Amendment claims because they did not act with deliberate indifference to Plaintiff Santana's or Mr. Cruz' need for outdoor exercise.  Second, Defendants argue that they are entitled to qualified immunity.  Third, Defendants argue that Plaintiffs are precluded under 42 U.S.C. § 1997e(e) from recovering damages for mental or emotional injuries.  Fourth, Defendants argue that Plaintiff Santana's request for injunctive relief has been rendered moot.

**A.   Eighth Amendment**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to provide prisoners humane conditions of confinement.  Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  To establish a violation of this duty, a prisoner must make a two-part showing.  Id.  First, a prisoner must demonstrate that he

has suffered an objectively serious deprivation, one that amounts to a denial of "the minimal civilized measures of life's necessities." Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). Second, a prisoner must demonstrate that the defendant acted with a sufficiently culpable state of mind. See Wilson v. Seiter, 501 U.S. 294, 299 (1991). Specifically, a prisoner must show that the defendant acted with "deliberate indifference" to the prisoner's health or safety. Farmer, 511 U.S. at 834; Foster, 554 F.3d at 812.

### 1. Serious Deprivation

For the purposes of this motion, Defendants do not dispute that Plaintiff Santana and Mr. Cruz suffered an objectively serious deprivation when they were denied outdoor exercise for more than five months. Indeed, it is well-established in the Ninth Circuit that "some form of regular outdoor exercise is extremely important to the psychologic and physical well being of . . . inmates," Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979), and that complete denials of outdoor exercise for extended periods of time may constitute sufficiently serious deprivations within the meaning of the Eighth Amendment. Thomas v. Ponder, 611 F.3d 1144, 1151 (9th Cir. 2010); LeMaire v. Maass, 12 F.3d 1444, 1457-58 (9th Cir. 1993). See, e.g., Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (finding that a complete denial of outdoor exercise for six and one-half weeks is a sufficiently serious deprivation to support a claim under the Eighth Amendment).

### 2. Deliberate Indifference

Defendants argue instead that Defendants Chrones, Knowles, and Frauenheim did not act with deliberate indifference. A defendant acts with deliberate indifference to a prisoner's health or safety when he has actual knowledge that a prisoner faces a substantial risk of serious harm yet disregards that risk by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 837, 847. In other words, deliberate indifference entails two parts: (1) the defendant was actually aware that the prisoner faced a substantial risk of serious harm; and (2) despite that awareness, the defendant failed to take reasonable measures to abate the danger or otherwise had no reasonable justification for allowing the prisoner to face that risk. See Thomas, 611 F.3d at 1150.

Here, the record plainly shows that Defendants Chrones, Knowles, and Frauenheim were aware that Plaintiff Santana and Mr. Cruz faced a substantial risk of serious harm to their health. Defendants

Chrones and Frauenheim authorized the initial lockdown, and Defendants Chrones, Frauenheim, and Knowles authorized the subsequent modified programming of Southern Hispanic inmates. Therefore, there can be no dispute that Defendants Chrones, Knowles, and Frauenheim were aware that Plaintiff Santana and Mr. Cruz (two inmates identified as Southern Hispanics) were denied outdoor exercise for over five months. Further, the risk of serious psychological and physical harm that could result from such prolonged deprivations of outdoor exercise should have been "obvious" to the defendants. See Farmer, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); Thomas, 611 F.3d at 1152-53 (concluding that extended denials of outdoor exercise pose an obvious risk to inmate health).

        The only issue remaining, then, is the second question of the deliberate indifference analysis: whether the defendants failed to take reasonable measures to abate the risk of harm to the prisoner or otherwise had no reasonable justification for allowing the prisoner to face that danger. On this issue, Defendants argue that the need to preserve institutional security and the safety of prison staff during a time of heightened prison violence justified denying Plaintiff Santana and Mr. Cruz access to outdoor exercise for over five months.

        Defendants' expert, a correctional officer assigned to the Institutional Gang Investigation Unit ("IGI") at KVSP, provides the following context. The term "Southern Hispanic" refers to a disruptive group comprised of inmates who are street gang members outside prison. While in prison, Southern Hispanic inmates act as a single body, which is how they ensure their own safety in the prison setting. Southern Hispanic inmates also act in concert with, and often at the direction of, the Mexican Mafia, a recognized prison gang. Because Southern Hispanic inmates are so closely aligned with the Mexican Mafia, prison staff understand that any particular incident of violence by a Southern Hispanic inmate may have been at the direction of the Mexican Mafia.

        Against this background, Defendants argue that the facts of this case are as follows. The May 31, 2006 assault presented prison officials with a genuine security emergency. The initial lockdown of all inmates was necessary so that prison officials could determine whether the assault presented an on-going threat to prison staff. When their initial investigation revealed that only Southern Hispanic and Mexican National inmates were involved in the May 31, 2006, assault, prison officials believed that it

was necessary to keep Southern Hispanic inmates on modified programming until further investigation could determine whether the group presented a systemic threat to staff safety. This determination was complicated and delayed by several incidents of disruptive behavior and threats against prison staff by Southern Hispanic inmates. At all times, prison officials were responding reasonably to the real threat of inmate violence against prison staff.

Based on the foregoing, Defendants have borne their initial responsibility as the moving party on summary judgment. The Ninth Circuit has explained that a prisoner's right to outdoor exercise is neither absolute nor indefeasible. See Norwood v. Vance, 591 F.3d 1062, 1068 (9th Cir. 2010). Prison officials must be allowed to balance a prisoner's right to outdoor exercise against other obligations that are imposed by law, including the obligation to ensure the safety and security of inmates and staff. See id. at 1069. Thus, in times of genuine emergency (i.e., when violence rises to unusually high levels), prison officials may reasonably conclude that it is necessary to curtail a prisoner's outdoor exercise in the interest of institutional security. See Thomas, 611 F.3d at 1154; Norwood, 591 F.3d at 1069. Here, Defendants present evidence showing that the lockdown and modified programming were imposed in response to a violent prison riot and were justified by the need to quell and investigate the potential for violence against prison staff.

The burden thus shifts to Plaintiffs to demonstrate the existence of a genuine issue of material fact on this issue. Plaintiffs respond with three arguments: (1) modified programming was imposed on Plaintiff Santana and Mr. Cruz because of their race, not because of their affiliation with a prison gang or disruptive group; (2) the modified programming affecting Plaintiff Santana and Mr. Cruz continued for an unreasonable amount of time; and (3) Defendants Chrones, Knowles, and Frauenheim failed to consider reasonable alternatives, such as utilizing the prison's mini-concrete yards, to provide Plaintiff Santana and Mr. Cruz access to outdoor exercise in spite of any on-going security concerns. The Court evaluates each argument below.

### a.     Race-Based Restriction

Plaintiffs dispute Defendants' contention that modified programming was imposed on Plaintiff Santana and Mr. Cruz because of their suspected affiliation with particular prison gangs or disruptive groups. Plaintiffs contend that modified programming was imposed on Plaintiff Santana and Mr. Cruz

simply because of their race or ethnicity.  As support for their argument, Plaintiffs rely primarily on the prison's "program status reports."

Program status reports are weekly reports sent to the Associate Director of Institutions during lockdowns or periods of modified programming.  The reports outline the current status of the lockdown or modified programming, the groups of inmates and programs affected, and the anticipated plan for returning to normal programming.  The reports are typically prepared by a ranking prison official and then endorsed by the warden.  In this case, Defendant Frauenheim prepared, and Defendants Chrones and Knowles endorsed, several program status reports during the course of the modified programming at issue in this case.

The program status reports highlighted by Plaintiffs are notable in several respects.  First, as a general matter, the program status reports use racial terms by default when referring to the inmates.  To indicate which group of inmates are affected by the lockdown or modified programming in place, the reports contain a section with boxes labeled "Black," "White," "Hispanic," and "Other."  These terms appear on their face to be racial categories, and KVSP's Department Operations Manual confirms that this is the case. (See ECF No. 181, Pls.' Ex. 16, at 3) ("When recording the 'Inmates Affected' section [of the program status report], consideration should be made as to the totality of the incident.  Any box not marked indicates that [the unmarked] *ethnicity* is not affected, and therefore under normal operating procedures.") (emphasis added).

Second, in several of their reports Defendants Chrones, Knowles, and Frauenheim use the term "Southern Hispanic" when referring to inmates of a specific race, as opposed to inmates belonging to a particular prison gang or disruptive group.  For example, in a program status report prepared on June 16, 2006, Defendants Chrones and Frauenheim indicate that Southern Hispanic and Mexican National inmates are the only *races* suspected of having been involved in the May 31, 2006 assault.  The report specifically states:

> On 05/31/06 several inmates attacked and battered staff at the conclusion of the evening meal.  From the inception of this occurrence, staff have been conducting interviews of all inmates, and have worked in conjunction with ISU and LEIU to determine the underlying cause of this incident.  *At this time, there is no information to indicate this incident included any race other than the Southern Hispanics, or Mexican Nationals.*  Based on this information it is recommended that the non effected [sic] inmates return to normal program.

(ECF No. 172, Defs.' Ex. F, at 11) (emphasis added).  Similarly, in a program status report prepared on September 6, 2006, Defendants Knowles and Frauenheim indicate that missing weapon stock was found among inmates of primarily one *race*, Southern Hispanics:

> On August 1, information was received that a cooking sheet was missing and the Southern Hispanic inmates were to attack staff with these items. *The weapon stock was discovered broken down and secreted in cells of different races, mainly Southern Hispanic inmates*. . . .  All inmates, with the exception of the Southern Hispanics will return to Normal Program on 9-7-06.

(Id. at 51) (emphasis added).

As a whole, the program status reports create a disputed issue of fact as to whether Defendants Chrones, Knowles, and Frauenheim used the term "Southern Hispanic" to refer to inmates of a specific race or ethnicity, as opposed to inmates belonging to a particular prison gang or disruptive group.  And as a corollary, the program status reports also create a disputed issue of fact as to whether Defendants Chrones, Knowles, and Frauenheim imposed modified programming on Plaintiff Santana and Mr. Cruz because of their race or ethnicity, as opposed to their affiliation with a prison gang or disruptive group.  But, this does not end the Court's inquiry.  To preclude summary judgment on this matter, the disputed issues of fact must be *material*.

The Eighth Amendment does not necessarily prohibit race-based restrictions on a prisoner's access to outdoor exercise.  Thus, Plaintiffs cannot withstand summary judgment by establishing, as a general matter, that the modified programming imposed on Plaintiff Santana and Mr. Cruz was race-based.  Rather, the dispositive question is this: assuming that modified programming was race-based, was there a sufficient nexus between the race-based restrictions and the need to restore and preserve institutional security?

The record shows that there was.  The undisputed facts establish that the May 31, 2006 assault created a genuine security emergency at KVSP.  Approximately twenty-five inmates were involved in a riot aimed at prison staff.  At least six inmates attacked two correctional officers.  The other inmates shouted, "Kick their heads in!" while attempting to impede efforts by prison officials to seal and secure the area.  Although the injuries suffered by the battered correctional officers were not ultimately grave (the most serious injury to a correctional officer appears to have been a dislocated wrist), the nature and the circumstances of the assault were certainly exceptional.  See Norwood, 591 F.3d at 1070 ("Attacks

on staff are, by their nature, more serious challenges to prison authority than attacks on other inmates."). A lockdown was therefore warranted.

After implementing a lockdown of Facility D, prison officials conducted an investigation into the causes of the assault. The initial investigation revealed that only Southern Hispanic and Mexican National inmates were involved. Assuming that "Southern Hispanic" is a purely racial term, and not a reference to a prison gang or disruptive group, then prison officials faced what could only be described as race-based violence against prison staff. Under these circumstances, prison officials were justified in imposing race-based modified programming on Southern Hispanic inmates while returning all other inmates to normal programming. There was a demonstrated need to protect prison staff from Southern Hispanic inmates in particular until further investigation could determine the exact nature of the threat and the potential for future violence against prison staff. Race-based violence is a real and ever-present concern for prison officials, and prison officials must be allowed to respond accordingly. See generally Johnson v. California, 543 U.S. 499, 512-13 (2005) (explaining, in the context of equal protection, that prison security is a compelling government interest and that the security implications of a prison race riot may justify temporary race-based restrictions).

It is therefore immaterial whether the term "Southern Hispanic" refers to a race or a disruptive group. In either scenario, there is no dispute that prison officials had genuine safety concerns regarding Southern Hispanic inmates and prison staff. As such, the decision to impose modified programming on Southern Hispanic inmates was justified, and Plaintiffs fail to raise a genuine issue of material fact with respect to this issue.

      **b.**  **Duration**

Next, Plaintiffs argue that the modified programming affecting Plaintiff Santana and Mr. Cruz continued for an unreasonable length of time. In Plaintiffs' view, the violence that occurred during that time frame did not rise to the level of a "genuine emergency" and therefore the modified programming should not have lasted for as long as it did.

As an initial matter, once prison officials justifiably implement a security lockdown or impose modified programming, there is no firm requirement that exceptional violence continue in order for the restrictions to remain in place. Such a requirement would place prison officials in a precarious position.

Any lockdown or modified programming successful in quelling violence for an appreciable amount of time would always be subject to attack on the basis that the restriction should have been lifted sooner. Yet, the Ninth Circuit has made it clear that decisions relating to prison security and safety are not to be judged in hindsight, and prison officials are entitled to "wide-ranging deference" in determining when outdoor exercise and other programs can safely be restored. Norwood, 591 F.3d at 1069. See Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011) (courts should not micro-manage prison; instead courts should defer to officials with expertise in prison management).

Here, the record shows that Defendants Chrones, Knowles, and Frauenheim acted reasonably and within the wide-ranging deference afforded to them. After modified programming was imposed on Southern Hispanic inmates, ISU and LEIU continued to investigate the underlying causes of the May 31, 2006 assault. Approximately one month later, prison officials began to gradually return Southern Hispanic inmates to normal programming. However, this process was disrupted when on July 31, 2006, a confidential informant advised prison staff that two metal sheets had been stolen; that inmates were fashioning weapons from the metal sheets; and that inmates were planning to attack prison staff with those weapons. Because the weapon stock was later discovered primarily in the mattresses of Southern Hispanic inmates, it was reasonable for prison officials to believe that Southern Hispanic inmates still posed a threat to staff safety.

By August 21, 2006, prison officials were unable to substantiate the threats made against prison staff. Nevertheless, Southern Hispanic inmates continued to pose security and safety issues throughout August and September. The most notable of these events included an attack on prison staff by Southern Hispanic inmates in Building 3 and information provided by a confidential informant indicating that Southern Hispanic inmates intended to "rush" the program office once they were returned to normal programming. As a result, prison officials did not begin returning Southern Hispanic inmates to normal programming until late October.

When viewed in isolation these later incidents do not appear to pose a particularly high threat to prison security. However, these incidents cannot be divorced from the context in which they took place. In light of the security concerns first presented by the May 31, 2006 assault and the incident regarding the hidden weapon stock, it was certainly reasonable for prison officials to proceed with

caution in returning Southern Hispanic inmates to normal programming.  See Norwood, 591 F.3d at 1069 ("At most, prison officials here may be faulted for erring on the side of caution by maintaining lockdowns for longer than necessary.  But, when it comes to matters of life and death, erring on the side of caution is a virtue.  Certainly, no officer could reasonably have anticipated that such prudence would be found to violate the Eighth Amendment.").  Accordingly, the record establishes that the duration of the modified programming was reasonable, and Plaintiffs fail to raise a genuine issue of material fact with respect to this issue.

### c. Reasonable Alternatives

Finally, Plaintiffs contend that despite any security concerns that may have existed at the time, Defendants Chrones, Knowles, and Frauenheim failed to consider reasonable alternative avenues for providing Plaintiff Santana and Mr. Cruz outdoor exercise.  In particular, Plaintiffs fault Defendants Chrones, Knowles, and Frauenheim for failing to utilize the prison's mini-concrete yards.[3]  Plaintiffs argue that mini-concrete yards were intended to serve the very purpose of providing inmates access to the outdoors during times of modified programming and heightened prison security.  Plaintiffs note as an example that KVSP prison officials utilized the mini-concrete yards in response to a violent inmate riot in 2009, which presumably was effective in ensuring that inmates received outdoor exercise while at the same time preserving institutional security.

Plaintiffs fall short in demonstrating that the mini-concrete yards were a reasonable alternative available to Defendants Chrones, Knowles, and Frauenheim.  There is no question that mini-concrete yards may be a reasonable alternative in certain situations.  But, Plaintiffs fail to explain why the mini-concrete yards were a reasonable alternative in *this* situation.  The central concern for prison officials after the May 31, 2006 assault was staff safety.  Plaintiffs fail to explain why the threat to staff safety was any less of a concern if inmates were allowed to exercise in the mini-concrete yards as opposed to the main yard.  From what the Court can glean from the limited record on this issue, it appears that the mini-concrete yards and the main yard have similar staffing requirements and require significant staff

---

[3] Each housing building in Facility D has a "mini-concrete yard."  The mini-concrete yard is an outdoor space that is roughly the size of a basketball court.  It is attached to the housing building, encircled by walls, and separated from the larger main yard.

14

exposure to inmates.[4]  Thus, on the present record, it is unclear how mini-concrete yards constitute a reasonable alternative when there are concerns for staff safety.

Plaintiffs' reference to the 2009 riot is unpersuasive and only further demonstrates why the use of the mini-concrete yards may be reasonable in one set of circumstances but not in another.  In March 2009, a prison riot broke out at KVSP between Southern and Northern Hispanic inmates.  One inmate was killed.  Prison officials responded by imposing modified programming on certain groups of both Southern and Northern Hispanic inmates.  As a result, those inmates lost normal main yard privileges and their movements were under escort at all times.  Nevertheless, despite being subject to modified programming, the inmates were still provided outdoor exercise access through the use of the prison's mini-concrete yards.

On the surface, the riot in 2009 and the assault at issue in this case bear superficial similarities: both involved inmate violence followed by modified programming.  Yet, a deeper examination of the two incidents reveal that they presented prison officials with entirely different security concerns.  The primary concern for prison officials during the 2009 riot appears to have been the potential for violence between various groups of inmates.  (See ECF No. 182, Pls.' Ex. 17, at 2) ("The ongoing investigation indicates potential violence is eminent on Facility B. . . .  The potential for violence remains between the Northern and Southern Hispanics at this time.").  Here, however, the key concern for prison officials was not inmate-on-inmate violence, but rather violence against prison staff.  This difference explains why the use of mini-concrete yards may have been a reasonable response to the riot in 2009, but not to the May 31, 2006 assault at issue in this case.  It is easy to see how the potential for inmate-on-inmate violence may be reduced when inmates are limited to exercising in smaller groups in the mini-concrete yards.  It is not apparent, however, how the use of mini-concrete yards reduces the potential for inmate violence against prison staff.

In sum, Plaintiffs fail to demonstrate that using the mini-concrete yards is a reasonable way to afford inmates outdoor exercise when there are legitimate concerns regarding staff safety.  Accordingly, Plaintiffs fail to raise a genuine issue of material fact as to whether Defendants Chrones, Knowles, and

---

[4] During modified programming, the movement of inmates is typically done under escort of correctional officers. If the mini-concrete yards are utilized, then correctional officers would presumably have to escort each inmate to the mini-concrete yards. This may actually *increase* staff exposure to inmates.

1  Frauenheim acted reasonably by not utilizing this option.

### B. Qualified Immunity

Even if Defendants Chrones, Knowles, and Frauenheim did violate the Eighth Amendment by denying Plaintiff Santana and Mr. Cruz outdoor exercise, the defendants are entitled to qualified immunity. Qualified immunity shields government officials from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009). The underlying purpose of qualified immunity is to balance two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to protect officials from harassment, distraction, and liability when they perform their duties reasonably. Id.

Determining whether an official is entitled to qualified immunity requires a two-part analysis. See Saucier v. Katz, 533 U.S. 194, 201 (2001). First, the court must decide whether the facts alleged, when taken in the light most favorable to the plaintiff, establish that the defendant's conduct violated a statutory or constitutional right. Id. Second, the court must decide whether that right was "clearly established." Id. A right is clearly established if "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted . . . or whether the state of the law [at the time of the violation] gave fair warning to the official[] that [his] conduct was [unlawful]." Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (internal quotation marks and citations omitted). If the defendant's conduct did not violate a statutory or constitutional right or if that right was not "clearly established," the defendant is entitled to qualified immunity. See Saucier, 533 U.S. at 201-02.

While it is often beneficial to approach the two-part analysis in the sequence outlined above, it is not mandatory. Pearson, 555 U.S. at 236. A district court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. If at any point the court is able to answer either prong in the negative, the defendant is entitled to qualified immunity. See, e.g., Tibbetts v. Kulongoski, 567 F.3d 529, 536-39 (9th Cir. 2009) (bypassing the first prong and granting the defendants qualified immunity because the plaintiff's due process right was not clearly established).

In this case, assuming that Defendants Chrones, Knowles, and Frauenheim violated the Eighth

16

Amendment by imposing modified programming on Southern Hispanic inmates only and by failing to lift the modified programming sooner, the dispositive question is whether this conduct violated clearly established law. The Court concludes that it did not. On this very issue, the Ninth Circuit has stated explicitly that as of 2011 it was *still* not clearly established "precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outdoor exercise, during and after a state of emergency called in response to a major riot[.]" Noble, 646 F.3d at 1143 (emphasis added). Therefore, the state of the law in 2006 (the year in which the conduct in this case took place) could not have afforded Defendants Chrones, Knowles, and Frauenheim fair warning that their actions were unlawful.

Plaintiffs attempt to draw a distinction between the Ninth Circuit's decision in Noble and the facts of this case. Plaintiffs argue that the facts of this case do not match the level of violence that was present in Noble and that unlike Noble this case did not involve an official state of emergency. These distinctions, however, make no difference. The central issue is whether prison officials faced a genuine security emergency such that it was reasonable to impose restrictions on a prisoner's outdoor exercise. If, as in this case, that is so, prison officials are afforded wide-ranging deference in determining how and when the restrictions are to be safely lifted. See Norwood, 591 F.3d at 1069-70.

The Court notes that there is no evidence that Defendants Chrones, Knowles, and Frauenheim acted with "manifest" deliberate indifference or an intent to inflict harm. Noble, 646 F.3d at 1143. The record clearly shows that Defendants Chrones, Knowles, and Frauenheim actively monitored the status of the modified programming and attempted to respond as best they could to the often delicate issue of balancing institutional security and inmate privileges. The Court is in no position to "micro-manage" prisons. Id. at 1147.

**C.     Remedies: Damages and Injunctive Relief**

Defendants argue that Plaintiffs are barred from recovering certain damages under 42 U.S.C. § 1997e(e) and that Plaintiff Santana's request for injunctive relief has been rendered moot because he is no longer confined at KVSP. In light of its finding that Defendants Chrones, Knowles, and Frauenheim are entitled to summary judgment on Plaintiffs' Eighth Amendment claim and are entitled to qualified immunity, the Court need not reach these issues.

## IV. CONCLUSION

Accordingly, for all the reasons discussed above, the Court GRANTS Defendants' motion for summary judgment. The trial date of February 26, 2013 is VACATED.

IT IS SO ORDERED.

**Dated:   September 14, 2012**                         /s/ Lawrence J. O'Neill
                                                                   UNITED STATES DISTRICT JUDGE